United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FOURTH DIMENSION SOFTWARE,
Plaintiff,

v.

DER TOURISTIK DEUTSCHLAND GMBH,
Defendant.

Case No. 19-cv-05561-CRB

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND GRANTING MOTION FOR SANCTIONS**

Fourth Dimension Software ("FDS") alleges that DER Touristik Deutschland GmbH ("DTDE") breached a software contract by overusing its licenses and providing software to a third party without FDS's authorization. DTDE now moves for summary judgment, primarily contending that FDS learned of the alleged breaches over a decade ago and that the statute of limitations bars FDS's claims. Motion for Summary Judgment ("MSJ") (dkt. 72–4). At the same time, FDS moves for sanctions against DTDE, alleging that DTDE had a duty to preserve usage records for the software at issue and that it violated that duty by deleting the records. Motion for Sanctions ("Motion") (dkt. 68). For the reasons explained below, the Court denies DTDE's summary judgment motion and grants FDS's motion for sanctions.

## I. BACKGROUND

DTDE is a German corporation that provides tourism and travel services. Order Denying MTD (dkt. 50) at 1. In 1994, DTDE entered a software development contract with FDS. Id. at 2. The contract contained two provisions relevant here. First, FDS

agreed to develop a tour operator automation system for DTDE called Phoenix. Id. After FDS completed Phoenix in 1996, DTDE assumed full ownership of the software. Id. Second, because Phoenix relied on three proprietary software tools that FDS developed—SafePath, EasyPath, and EasyClient ("the Tools")—DTDE agreed to license the Tools from FDS in connection with its use of Phoenix. Fahimi Decl. (dkt. 84–6) Ex. 2, at 36:02–19; see also id. Ex. 10, at 62:03–05. In short, DTDE owned Phoenix, but it licensed three of the tools that Phoenix relied on to run. See id.

FDS alleges that DTDE breached the contract in two ways. See FAC (dkt. 46) ¶¶ 33–39. First, the contract imposed license caps that limited DTDE's use of the Tools, and FDS alleges that DTDE breached the contract by exceeding its license caps for the Tools. Id. ¶ 31. Second, the contract prohibited DTDE from providing or sublicensing the Tools to a third party. Id. ¶¶ 22–23, 27–30. FDS alleges that DTDE violated this provision because it provided Phoenix to a third party named Aovo. Id. By making Phoenix available to Aovo, DTDE necessarily provided Aovo with the Tools, which Phoenix uses to run. Id.

**A. DTDE's Statute of Limitations Defense**

DTDE's primary argument in support of its motion for summary judgment is that the statute of limitations bars FDS's claims. See generally MSJ. DTDE contends that for over a decade, FDS knew that (1) DTDE was exceeding its license caps for the Tools and (2) DTDE had made Phoenix available to a third-party. Id. The following background sets forth the facts relevant to this defense.

**1. License Overuse**

Ilya Pavolotsky, the founder and CEO of FDS, testified that in 2000, he became suspicious that DTDE was exceeding its license caps for the Tools. Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:25; Fahimi Decl. (dkt. 84–6) Ex. 2, at 41:11–42:04. Pavolotsky explained that the "issue was brought to us by our employees" who had "indications that the number of copies were way, way above of what was allowed." Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:02. While Pavolotsky's testimony suggests that FDS had ways of

United States District Court
Northern District of California

monitoring DTDE's usage of the Tools, other FDS employees testified that FDS depended on DTDE's self-reporting to determine how many licenses were in fact being used. Compare Fahimi Decl. (dkt. 84–6) Ex. 2, at 58:16–59:02 with Fahimi Decl. (dkt. 84–6) Ex. 3, at 67:10–69:18.

FDS's suspicions that DTDE was overusing the Tools led to a multi-year back-and-forth, in which FDS repeatedly expressed its concerns in letters and emails to DTDE. See, e.g., Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14; Ex. 8. The communications took place from 2001 to 2004 and involved both FDS lawyers and employees sending inquires to DTDE about suspected license overuse. See, e.g., Medlong Decl. (dkt. 73–1) Ex. 10, at DTDE0000915; Ex. 12, at DTDE0000775; Ex. 13, at FOURTH DIMENSION _006033. Based on the record, DTDE did not respond to many of FDS's inquires in writing.

The issue apparently came to a head in March 2004 when counsel for FDS sent DTDE a letter regarding DTDE's alleged violation of the license caps. Medlong Decl. (dkt. 73–1) Ex. 14, at FOURTH DIMENSION _000125. The opening of the letter is unequivocal:

> I am writing to object to [DTDE's] unauthorized copying and use of Fourth Dimension Software's (FDS) EasyClient Run Time software product. [DTDE] has exceeded the licensed quantity (300) stated in the underlying license agreement …

Id. The letter goes on to explain the basis for the allegation, and it concludes with a firm warning: "Be assured that this is FDS' last attempt to amicably resolve this matter." Id. at FOURTH DIMENSION _ 000126.

Despite the firmly worded warning, FDS did not end up pursuing claims in 2004. In response to questions about why FDS did not follow through on its threat of litigation, FDS's witnesses testified that DTDE responded to FDS's questions about the suspected license overuse by telling FDS "we are not doing anything wrong." Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14; Fahimi Decl. (dkt. 84–6) Ex. 2, at 41:11–42:04 ("They just told us, 'Believe us, we are not stealing from you.'"); Ex. 3, at 74:13–75:08. FDS's

witnesses explained that the company accepted DTDE's assurances because DTDE "is a well-known German company" and the idea that they would be breaching the contract was "inconceivable." Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14. In particular, Pavolotsky testified that he "let it slide, somehow believing that company like that [sic] will not disinform us or underreport whatever was going on." Fahimi Decl. (dkt. 84–6) Ex. 2, at 59:17–61:21.

**2. Aovo's Use of Phoenix**

Pavolotsky testified that FDS did not discover that DTDE was making Phoenix available to Aovo until "2015 or 2016."[1] Fahimi Decl. (dkt. 84–6) Ex. 2, at 58:16–59:08 & 235:18–236:19; Ex. 5, at 64:20–65:09; see also Medlong Decl. (dkt. 73–1) Ex. 2, at 42:14–43:12. In late 2015, Aovo approached FDS to discuss licensing Phoenix from FDS because DTDE "would no longer support them for the software for the Phoenix system."[2] Medlong Decl. (dkt. 73–1) Ex. 2, at 42:14–24. Pavolotsky testified that the fact that AOVO was using Phoenix "implied that they were using our tools." Medlong Decl. (dkt. 73–1) Ex. 2, at 42:14–43:12. It was the first the company learned that Aovo might be using Phoenix. Id.

FDS continued to investigate and in or around September 2017, "they learned the extent of the relationship between Aovo and [DTDE]," including that DTDE "allowed Aovo to use EasyClient, SafePath, EasyPath without letting Fourth Dimension know." Medlong Decl. (dkt. 73–1) Ex. 2, at 44:02–22 & 45:23–46:09. FDS "had no idea" DTDE was making Phoenix available to AOVO before then. Medlong Decl. (dkt. 73–1) Ex. 2, at 48:10–18. The parties attempted to resolve the issue without a lawsuit, but the negotiations were unsuccessful, and FDS filed suit in April 2019. See Notice of Removal

[1] While testimony from FDS's witnesses varied on whether they became suspicious of third-party usage in 2015 or 2016, documents show that FDS began discussing the issue in 2015. See Fahimi Decl. (dkt. 84–6) Ex. 2, at 235:18–236:19; Ex. 8, at DTDE0000051.

[2] In a November 24, 2015 letter, DTDE also wrote to FDS to ask about making Phoenix available "to another business company" and asked to confirm "this possibility of utilization by a third party." Fahimi Decl. (dkt. 84–6) Ex. 8, at DTDE0000051.

(dkt. 1).

## II. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute of fact is one that could reasonably be resolved in favor of either party. See Celotex, 477 U.S. at 323–24. A dispute is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).

"A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)). "In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." Id. (citation omitted).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything." Id. at 1103 (citation omitted). If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense. See id. If the nonmoving party fails to produce enough evidence to create a genuine dispute of material fact, the moving party wins the motion for summary judgment. See id. But if the nonmoving party produces enough evidence to create a genuine dispute of material fact, the nonmoving party defeats the motion. See id.

United States District Court
Northern District of California

**B. Motion for Sanctions**

Rule 37(e) governs the remedies available for the failure to preserve electronically stored information. Fed. R. Civ. P. 37(e); see also Fed. R. Civ. P. 37, 2015 Advisory Committee Note to 2015 Amendment ("New Rule 37(e) … forecloses reliance on inherent authority or state law[.]"). Under Rule 37(e), if a party has a duty to preserve electronically stored information, the party "failed to take reasonable steps to preserve it," and the loss of the information prejudiced another party, then the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

If the court also finds that the party "acted with the intent to deprive another party of the information's use in litigation," then the court may:

> (A) presume that the lost information was unfavorable to the party;
>
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>
> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e)(2).

## III. DISCUSSION

### A. Motion for Summary Judgment

#### 1. Statute of Limitations

FDS alleges breach of contract under California law, and DTDE argues that the window for FDS to brings its breach of contract claims closed over a decade ago. Under California law, the elements of a breach of contract claim are: (1) existence of a contract, (2) plaintiff's performance of the contract or excuse for nonperformance, (3) defendant's breach, and (4) resulting harm to the plaintiff. Careau & Co. v. Sec. Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1371, 1388 (1990); CDF Firefighters v. Maldonado, 158 Cal. App. 4th 1226, 1239 (2008).

California's statute of limitations applies to FDS's breach of contract claim. See Bronson v. Samsung Elecs. Am., Inc., No. C 18-2300 WHA, 2018 WL 5809418, at *3 (N.D. Cal. Nov. 6, 2018). The statute of limitations for a breach of contract claim under

California law is four years. Cal. Civ. Proc. Code § 337; Perez-Encinas v. AmerUs Life Ins. Co., 468 F. Supp. 2d 1127, 1133–34 (N.D. Cal. 2006).

In California, a strict rule generally applies to the start of the statute of limitations, namely: the statute begins to run "from the moment a claim accrues." Aryeh v. Canon Bus. Sols., Inc., 55 Cal. 4th 1185, 1189 (2013). A claim accrues when "all essential elements are present and a claim becomes legally actionable." Glue-Fold, Inc. v. Slautterback Corp., 82 Cal. App. 4th 1018, 1029 (2000). If "all essential elements are present," then the statutory clock starts, "regardless of whether any damage is apparent or whether the injured party is aware of his right to sue." Perez-Encinas, 468 F. Supp. 2d at 1133–34; Gabriel Tech. Corp. v. Qualcomm Inc., 857 F. Supp. 2d 997, 1010 (S.D. Cal. 2012).

California's strict rule regarding the start of the statute of limitations is not without exceptions, and the main exception is the discovery rule. See Moreno v. Sanchez, 106 Cal. App. 4th 1415, 1423 (2003) (the discovery rule mitigates the "harshness" of the general rule that the statute starts when a claim accrues). Under the discovery rule, the statute of limitations does not start until "plaintiff discovered or could have discovered, through the exercise of reasonable diligence, all of the facts essential to his cause of action." Perez-Encinas, 468 F. Supp. 2d at 1134 (citing April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805, 826 (1983)). The principle underlying the discovery rule is that "it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware that they have been injured." Moreno, 106 Cal. App. 4th at 1423.

Courts consider three factors to determine whether the discovery rule applies to the circumstances of a particular case: (1) "[t]he injury or the act causing the injury, or both, have been difficult for the plaintiff to detect;" (2) "the defendant has been in a far superior position to comprehend the act and the injury;" and (3) "the defendant had reason to believe the plaintiff remained ignorant he had been wronged." Gryczman, 107 Cal. App. 4th at 5 (quoting April Enterprises, Inc. v. KTTV, 147 Cal. App. 3d 805, 831 (1983)). Two "overarching principles" guide the analysis: (1) "plaintiffs should not suffer where

United States District Court
Northern District of California

circumstances prevent them from knowing they have been harmed" and (2) "defendants should not be allowed to knowingly profit from their injure's [sic] ignorance." Id. (citation omitted).

The plaintiff bears the burden of showing that the discovery rule applies.[3] Glue-Fold, 82 Cal. App. 4th at 1018; Aryeh, 55 Cal. 4th at 1192. If the plaintiff shows that the discovery rule applies, it must then demonstrate that it exercised reasonable diligence to discover "all of the facts essential to [the] cause of action." Perez-Encinas, 468 F. Supp. 2d at 1134; Gryczman, 107 Cal. App. 4th at 7 ("[t]he issue which must be shown to be triable is whether plaintiff exercised due diligence in discovering the breach").

Here, DTDE argues that both of the alleged breaches occurred over a decade ago, and so the four-year statute of limitations forecloses both of FDS's claims. Each breach theory will be analyzed in turn.

**a. Third-Party Usage**

DTDE admits that it has "hosted Phoenix for Aovo's benefit since 2000." MSJ at 8. Thus, under FDS's theory of liability, DTDE breached the contract over twenty years ago, and the four-year statute of limitations lapsed in 2004. But FDS argues that the discovery rule applies because it had no notice of DTDE's breach until 2015. Opp. at 13–14. DTDE responds that the discovery rule does not apply because Aovo disclosed its use of Phoenix and DTDE brought that use to the attention of FDS well before 2015. MSJ at 8–12.

The discovery rule applies here, and disputes of material fact preclude summary judgment on the third-party use theory. Two factors support application of the discovery rule: (1) the injury was difficult for FDS to detect and (2) DTDE was in a far superior position to comprehend the injury. In particular, FDS offers evidence that it did not know

[3] Plaintiff cites Alvarado for the proposition that the "defendant carries the burden of establishing the discovery rule is inapplicable to the statute of limitations. Opp. at 12 (citing Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp., No. 11-CV-246-IEG RBB, 2013 WL 2351814, at *8–9 (S.D. Cal. May 24, 2013)). While Alvarado required the defendant "to show that the discovery rule is inapplicable," see Alvarado, 2013 WL 2351814, at *9, the California Supreme Court has stated that the plaintiff carries the burden. See Aryeh, 55 Cal. 4th at 1197. Because California law controls here, the rule articulated by the California Supreme Court is binding, and FDS bears the burden of showing the discovery rule applies.

United States District Court
Northern District of California

that Aovo—a German company with which it had no prior relationship—existed until 2015. Fahimi Decl. (dkt. 84–6) Ex. 2, at 58:16–59:08. FDS also offers evidence that it had no way of detecting Aovo's use of the Tools and that it did not become suspicious of Aovo's use of the Tools until Aovo approached it in 2015 to discuss licensing the Tools. Fahimi Decl. (dkt. 84–6) Ex. 2 at 235:18–236:19; Ex. 5, at 64:20–65:09; see also Medlong Decl. (dkt. 73–1) Ex. 2, at 42:14–43:12. These facts—which tend to suggest that DTDE went behind FDS's back to provide Phoenix to Aovo—support application of the discovery rule.[4]

DTDE's arguments that FDS knew or should have known about Aovo's use of Phoenix before 2015 fall short. DTDE cites a July 23, 2001 email, in which a DTDE employee tells Pavolotsky, "Regarding T&T, we have between 10 to 15 people working with Phoenix." MSJ at 10 (citing Medlong Decl. (dkt. 73–1) Ex. 11 at DTDE0000848). But the email does not establish that "T&T" is a third-party—as opposed to a division or group within DTDE—let alone show that "T&T" refers to Aovo. Nor does any other evidence in the record establish beyond reasonable dispute that FDS understood "T&T" to refer to Aovo.

DTDE also cites a September 2001 email in which FDS accuses DTDE of "unauthorized sublicensing and/or use of FDS' proprietary software tools." MSJ at 11 (citing Medlong Decl. (dkt. 73–1) Ex. 12 at DTDE0000775). But the statements in the email are broad and general, and it is far from clear whether the author is referring to specific concerns about a particular party, or simply making a broad allegation against a suspected bad actor. Reasonable minds could differ as to whether the email even refers to Aovo, much less whether it put FDS on notice of Aovo's use of Phoenix.

---

[4] DTDE leans heavily on Perez-Encinas, 468 F. Supp. 2d at 1135, to argue that the discovery rule applies even where "plaintiffs had no way of knowing the facts constituting their causes of action for years after the breach occurred." MSJ at 10–11. But, as DTDE recognizes, "Perez-Encinas was not a case involving a *secretive* breach." MSJ at 10 (original emphasis). In contrast, this case does involve a secretive breach, as there is a reasonable dispute as to whether DTDE provided Phoenix to Aovo for years without telling FDS.

DTDE also points to German regulatory filings that Aovo made in 2006 as part of the process of making a public offering in Germany. MSJ at 11–12. Among many other things, the regulatory filings state that one of Aovo's "essential assets" is the "license to the tour operator software Phoenix." See, e.g., RJN (dkt. 74) Ex. 4 at 15. DTDE argues that the filings show that "DTDE did nothing to conceal Aovo's use of Phoenix." MSJ at 12. FDS objects to the German regulatory filings on several grounds. See Opp. at 18, fn. 7; Opp. to RJN (dkt. 85) 2–4. But even assuming that the filings are admissible and that the contents can be taken as true, they do not establish that there are no disputes of material fact. DTDE argues that the filings show it "did nothing to conceal Aovo's use of Phoenix," but Aovo made the filings, not DTDE. And FDS employees testified that they did not know Aovo existed until late 2015, while DTDE admits to have known about Aovo's use of Phoenix for over a decade. Fahimi Decl. (dkt. 84–6) Ex. 2, at 58:16–59:08. In addition, these are German regulatory filings, and a reasonable jury could find that the foreign filings did not provide sufficient notice of Aovo's use of Phoenix, such that FDS knew or should have known about it. See Gryczman, 107 Cal. App. 4th at 6 (the discovery rule "applies when the injury or act causing the injury is 'difficult' for the plaintiff to detect, not impossible").

In sum, there is a genuine dispute of material fact regarding when FDS knew or reasonably should have known about its claim against DTDE based on Aovo's use of Phoenix. While DTDE argues that FDS knew or should have known about the claim in the early 2000's, FDS responds with evidence indicating that it was not aware of the claim until 2016. These are questions of fact that a jury must decide.

**b. License Overuse**

Disputes of material fact preclude summary judgment with respect to the license overuse theory for two reasons.

First, unlike the third-party use theory where DTDE admits to providing the Tools to Aovo, DTDE denies overusing the licenses for the Tools. See MSJ at 9 ("DTDE denies that it ever exceeded the number of licenses allotted to it"); see also Opp. at 16 ("The

question of breach [] is disputed[.]”). Summary judgment is not proper for this reason alone. All of the elements of a claim must accrue for the statute of limitations to start, and there is a dispute of fact regarding whether—and if so, when—DTDE ever breached the contract by overusing the licenses. Thus, there is a dispute of fact about when—if ever—the claim accrued and the statute began to run.

Second, even assuming that there was no dispute that DTDE began exceeding the license caps in the early 2000’s, the discovery rule applies, and there is a dispute of material fact as to when FDS should have discovered the breach. The discovery rule applies because the overuse theory—like the third-party use theory—centers on allegations that DTDE intentionally deceived FDS as to its overuse of the licenses. FDS witnesses testified that they repeatedly raised the issue of overuse with DTDE and that DTDE repeatedly told them that they were not overusing the licenses. Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14; Fahimi Decl. (dkt. 84–6) Ex. 2, at 41:11–42:04; Ex. 3, at 74:13–75:08. These facts suggest knowing deception that warrants application of the discovery rule.[5]

Further, a factual dispute exists as to when FDS knew or should have known about the alleged overuse. On the one hand, DTDE points to a series of communications that FDS sent to DTDE in the early 2000’s, all of which raised the issue of DTDE’s alleged overuse of the licenses. See, e.g., Medlong Decl. (dkt. 73–1) Ex. 8; Ex. 12, at DTDE0000775. Some of these communications are strongly worded and suggest that FDS firmly believed that DTDE was exceeding its license limits. See Medlong Decl. (dkt. 73–1) Ex. 14, at FOURTH DIMENSION _000125–126 (2004 letter asserting that DTDE “has exceeded the license quantity” and that “this is FDS’ last attempt to amicably resolve this matter”). Consistent with these communications, FDS employees testified that there were strong suspicions in the early 2000’s that DTDE was overusing the licenses in violation of

[5] As discussed, an FDS witness testified that the company depended on DTDE’s accurate self-reporting of its license usage to determine how many licenses were in use. See Fahimi Decl. (dkt. 84–6) Ex. 3 at 67:10–69:18. In other words, evidence suggests that FDS had no independent way of determining whether DTDE was overusing the licenses.



United States District Court
Northern District of California

the contract. See, e.g., Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:02; Fahimi Decl. (dkt. 84–6) Ex. 2, at 41:11–42:04, 58:16–59:02, 121:03–15. These facts tend to suggest that FDS knew or should have known of the breach in the early 2000's and that it should have brought its claim then.

But on the other hand, FDS's witnesses testified that when they raised the issue of the suspected overuse with DTDE, DTDE assured them that "we are not doing anything wrong." Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14; Fahimi Decl. (dkt. 84–6) Ex. 2, at 41:11–42:04 ("They just told us, 'Believe us, we are not stealing from you.'"); Ex. 3, at 74:13–75:08. FDS's witnesses testified that they accepted these assurances because DTDE is "a well-known German company," and it seemed "inconceivable" they would breach the contract. Medlong Decl. (dkt. 73–1) Ex. 1, at 59:9–60:14. An FDS witness also testified that while FDS suspected a breach, they had "no way" to audit DTDE's use of the licenses and depended on DTDE's self-reporting of its license usage. Fahimi Decl. (dkt. 84–6) Ex. 3 at 67:10–69:18 & 74:13–75:16.

Viewing the record in the light most favorable to FDS, there is a dispute of material fact as to when FDS knew or should have known about the alleged breach of the license caps. A jury could find that FDS acted reasonably from 2001 to 2004 when it accepted DTDE's assurances that it was not overusing the licenses or, alternatively, a jury could find that FDS acted unreasonably in accepting DTDE's assurances and that FDS knew or should have known that DTDE was exceeding its licenses then. Either way, the determination involves questions of credibility and fact that preclude summary judgment.[6]

[6] DTDE also argues that even if disputes of material fact preclude summary judgment on the overuse theory, that theory should be narrowed to claims involving the EasyClient licenses. MSJ at 17–18. DTDE specifically argues that FDS' corporate designee testified that FDS is not claiming that there was over-usage of SafePath or EasyPath because usage of both tools was unlimited. Medlong Decl. (dkt. 73–1) Ex. 3 at 71:8–72:3. In response, FDS cites the report of its expert Eric Cole, who opined, among other things, that "the number of licenses required [for all three tools] would logically increase" as DTDE's usage increased. Opp. at 24–25 (citing Fahimi Decl. Ex. 18 at 6–9). While the corporate designee's seemingly unequivocal testimony makes this issue close, the record as a whole is not clear enough to establish that there is no dispute of material fact. The evidence on whether SafePath and EasyPath can be overused is conflicting, and

United States District Court
Northern District of California

**2. Waiver**

Separate from the statute of limitations defense, DTDE argues that FDS waived its claims because it accepted payment for several years despite knowing about both of the alleged breaches. MSJ at 15. In response, FDS argues that it "could not have intended to waive its breach of contract claims because it did not have knowledge of DTDE's misconduct until 2016." Opp. at 22–23.

Waiver occurs where "a plaintiff has knowledge of the defendant's breach and continues to perform under the contract and/or accepts the defendant's performance without notifying the defendant of the breach[.]" Roling v. E*Trade Sec. LLC, 860 F. Supp. 2d 1035, 1039 (N.D. Cal. 2012). Waiver "generally involves a clear, involuntary, intentional, and knowing expression." Harvard Investment Co. v. Gap Stores, Inc., 156 Cal. App. 3d 704, 711 n. 6 (1984).

Disputes of material fact preclude summary judgment with respect to DTDE's waiver defense. Waiver depends on a plaintiff having "knowledge of the defendant's breach."[7] Roling, 860 F. Supp. 2d at 1039. As discussed above, there are disputes of material fact as to when FDS knew or should have known about DTDE's alleged breaches.

**B. Motion for Sanctions**

FDS moves for sanctions based on DTDE's failure to preserve electronic records of usage for Phoenix and the Tools ("usage records").[8] See generally Motion. The usage records would purportedly show (1) the extent to which DTDE used the Tools and (2) the extent to which Aovo used Phoenix. FDS contends that DTDE's duty to preserve the usage records arose in September 2017 and that DTDE violated this duty by deleting the records in 2018. Id. DTDE opposes the motion. Opposition ("Opp.") (dkt. 78–4).

---

so the question is ultimately one for the jury.

[7] DTDE's reliance on Roling and Rubin is misplaced. See MSJ at 16–17. In Roling, plaintiffs conceded that they had known for years about the conduct that allegedly constituted the breach. Roling, 860 F. Supp. 2d at 1039–40. Similarly, in Rubin, the court found waiver where a party accepted payment for at least a year despite knowing about the breach. Rubin, 159 Cal. App. 3d at 296.

[8] FDS claims that DTDE also "likely destroyed" paper records, but it offers no evidence to support this claim. Mot. at 12.

United States District Court
Northern District of California

**1. Relevant Background**

In September 2017, former counsel for FDS sent DTDE a letter, alleging that DTDE violated the license agreements by exceeding the license caps for the Tools and by providing Phoenix to Aovo. Fahimi Decl. ISO Mot. for Sanctions ("Fahimi Decl. II") (dkt. 68–6), Ex. 1 at 1–3. The letter states that if "a mutually agreeable solution cannot be reached," FDS is "prepared to initiate litigation" and "will request relevant documents and deposition testimony through the California courts." Id. at 1

Counsel for DTDE responded to FDS's September 2017 letter "in or about" November 2017. Fahimi Decl. II (dkt. 68–6) ¶ 2. In the months that followed, counsel for FDS and DTDE engaged in "pre-litigation discussions," but they failed to resolve the dispute. Id. On August 31, 2018—almost a year after the pre-litigation discussions began—counsel for FDS sent DTDE a letter making "a final inquiry" about whether DTDE was willing to settle the claims "without the need to file litigation." Fahimi Decl. ISO Reply ("Fahimi Decl. III") (dkt. 81–6), Ex. 3 at FOURTH DIMENSION_005396. The letter apparently attached a draft complaint that FDS intended to file in the event the informal negotiations failed.[9] Id. The record does not contain any response from DTDE to the August 31, 2018 letter.

On November 9, 2018, DTDE's Chief Information Officer sent FDS a letter with the subject "Termination of license contracts." Fahimi Decl. II (dkt. 68–6), Ex. 3 at DTDE0000073. The letter states that DTDE will terminate the license contracts for the Tools at "the end of the year 2018" and that it will remove the software "from any given machine." Id. The letter also states that DTDE "would like to resolve the legal issues in an amicable way and to enter out-of-court negotiations to settle the issue." Id. The parties did not achieve resolution, and FDS filed a complaint against DTDE on April 22, 2019. See Notice of Removal (dkt. 1).

During discovery, FDS learned that when DTDE "remove[d] [the Tools] from any

[9] The letter refers to a complaint that was ostensibly attached to it, but no copy of the complaint is included in the record here.

given machine" at the end of 2018, it effectively deleted all records of usage of the Tools. See Fahimi Decl. II (dkt. 68–6), Ex. 2 at 55:25–57:10 & 57:19–58:05. As a result of the deletion, "DTDE no longer possesses data regarding access and usage of Phoenix and the Tools and is unable to extract any additional information regarding the number of licenses used." Fahimi Decl. II (dkt. 68–6), Ex. 4 at 3–5.

**2. Analysis**

Under Rule 37(e), a party seeking sanctions for the loss of electronically stored information must show: (1) there was a duty to preserve the information; (2) the party who lost the information failed to take reasonable steps to preserve it; and (3) loss of the information prejudiced another party. See Fed. R. Civ. P. 37(e)(1). If this showing is made, the court "may order measures no greater than necessary to cure the prejudice." Id. To obtain more severe sanctions, including an adverse inference or default judgment, the moving party must also show that the party who failed to preserve the electronically stored information "acted with the intent to deprive another party of the information's use in litigation." See Fed. R. Civ. P. 37(e)(2).

For the reasons discussed below, DTDE had a duty to preserve the usage records, it violated that duty by deleting the records, the deletion prejudiced FDS, and DTDE acted with an intent to deprive FDS of the records' use.

**a. Duty to Preserve**

DTDE's duty to preserve the usage records arose in August 2018, at the latest. The duty to preserve "extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." CTC Glob. Corp. v. Huang, No. SACV1702202AGKESX, 2019 WL 6357271, at *2 (C.D. Cal. July 3, 2019) (citation omitted); see also In re Napster, Inc. Copyright Litig., 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) ("As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action."). Here: (1) FDS gave DTDE notice of both the license overuse and third-party use claims in September 2017; (2) the parties proceeded to attempt to negotiate a settlement of the

United States District Court
Northern District of California

claims for nearly a year; (3) and FDS sent DTDE a letter in August 2018 stating that it intended to file a complaint if DTDE declined its final offer to settle. Thus, DTDE knew or should have known about the potential claims and the evidence relevant to those claims by at least August 2018.

DTDE argues that its duty to preserve did not arise until FDS filed suit in April 2019. Opp. at 9–14. Its arguments are not persuasive. DTDE contends that the letter that FDS sent in September 2017 was not a "credible threat of litigation" because FDS previously threatened litigation in the early 2000's, but it never followed through and pursued any of its claims. Id. at 9–11. But even if the September 2017 letter did not trigger a duty to preserve, the duty to preserve certainly arose during the following months-long discussion between the parties about how to resolve the claims, which culminated in FDS making a "final inquiry" in August 2018 to see whether DTDE was inclined to resolve the dispute without litigation.

DTDE also argues that this case presents a "question of first impression regarding the duration of a party's duty to preserve evidence." Opp. at 11–14. DTDE contends that FDS has repeatedly threatened litigation over the years, which raises the question of "whether one party can impose on another an interminable duty to preserve ESI by periodically threatening litigation for the same alleged conduct over many years." Id.

DTDE's argument misses the mark for two reasons. First, the question of whether the litigation letters that FDS sent in the early 2000's gave rise to a duty to preserve is not before the Court. Second, even assuming that the question was before the Court, there appear to be significant differences between what happened in the early 2000's versus what happened from 2017 to 2018. In the early 2000's, none of the letters specifically raised claims about Aovo's overuse, whereas that issue was specifically raised from 2017 onward. Additionally, in the early 2000's, DTDE responded to the letters by assuring FDS that it was not overusing the licenses, whereas in September 2017, DTDE began the process of negotiating with FDS in an attempt to resolve the issues "in an amicable way and to enter out-of-court negotiations to settle the issue." Put another way, DTDE

implicitly recognized that the claims may have merit in 2017, while it explicitly denied the merit of the claims in the early 2000's. Thus, the circumstances of 2017 to 2018 support a finding of a duty to preserve, while the same may not be true of those from the early 2000's.

**b. Prejudice**

"The Court has discretion to determine whether the loss of the information is prejudicial." Hernandez v. Tulare Cnty. Correction Ctr., No. 16-cv-00413, 2018 WL 784287, at *4 (E.D. Cal. Feb. 8, 2018). "The Court's evaluation of whether the loss of information was prejudicial depends in part on the importance of the information to the case." Ramirez v. Zimmerman, No. 17-cv-01230, 2020 WL 905603, at *2 (S.D. Cal. Feb. 25, 2020).

FDS contends that it was "severely prejudiced" by DTDE's failure to preserve the usage records, but it does not provide much in the way of specifics to support that contention. See Motion at 14–15. To be sure, the usage records appear to go straight to the heart of FDS's claims—if the records showed the extent to which Aovo used Phoenix and the extent (if any) to which DTDE exceeded its license caps, then FDS would have strong (if not dispositive) evidence of breach of contract and would presumably be able to calculate damages with a higher degree of precision. But FDS does not make either of these points in any detail, and it spends only one paragraph of its motion discussing the extent to which it has been prejudiced. See id.

The parties' briefs also refer to other evidence that appears to mitigate the effect of the loss of the usage records. For example, DTDE produced a log showing, at least for a certain point in time, the number of Aovo users with access to Phoenix. Opp. at 15 (citing Medlong Decl. (dkt. 79–1) Ex. 29 at DTDE0000130). While FDS responds that the log only provides usage detail from one point in time, it does still provide evidence of Aovo's usage of Phoenix—a fact that FDS does not deny. Additionally, FDS has prepared an expert report that calculates damages for the overuse of the Tools, based on the expert's estimates of how the license usage would increase over time. See Fahimi Decl. (dkt. 68–6)

United States District Court
Northern District of California

Ex. 18.

In sum, there is evidence that DTDE breached the contract by making Phoenix available to Aovo and evidence showing, at least for one point in time, the extent of Aovo's use of Phoenix. There is also evidence suggesting that DTDE would have needed more licenses for the Tools over time and evidence of the damages that FDS suffered because of DTDE's alleged overuse of the Tools. Thus, the loss of the records appears to prejudice FDS in two ways: (1) to the extent that it claims that DTDE breached the contract by overusing the Tools, FDS apparently has no direct evidence of the overuse (if any), nor does it have direct evidence of the specific extent of the overuse (if any); and (2) although DTDE admits to making Phoenix available to Aovo, FDS apparently has no way of determining the specific number of Aovo users with access Phoenix.

**c. Intent**

The severity of the sanctions for loss of electronically stored information increase if a party establishes that the information was intentionally destroyed. See Fed. R. Civ. P. 37(e); CTC Glob. Corp. v. Huang, No. SACV1702202AGKESX, 2019 WL 6357271, at *2 (C.D. Cal. July 3, 2019). A party's deletion of information qualifies as intentional "if the party 'has some notice that the documents were *potentially* relevant to the litigation before they were destroyed.'" Leon v. IDX Sys. Corp., 464 F.3d 951, 959 (9th Cir. 2006) (quoting United States v. Kitsap Physicians Serv., 314 F.3d 995, 1001 (9th Cir. 2002) (original emphasis). In determining whether deletion is intentional, courts assess the circumstances of the deletion, including "the timing of the destruction" and "the method of deletion (e.g. automatic deletion vs. affirmative steps of erasure)[.]" See Lamb v. Horbaczewski, No. 17-cv-06210-JAK, 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020).

The record here supports an inference that DTDE intentionally destroyed the usage records. Months before they were destroyed, DTDE knew or, at the very least, should have known that the usage records were highly relevant to FDS's claims. The parties had been discussing FDS's claims based on the records for almost a year, and FDS had sent DTDE a "final" notice in August 2018 informing DTDE that it intended to file a complaint

if the dispute could not be resolved out of court. In short, DTDE had notice that the records were highly relevant, and it destroyed them shortly after receiving notice that FDS was prepared to file suit.

DTDE argues that the record makes clear that it did not act with requisite intent. In particular, DTDE points to two letters from DTDE to FDS that it claims show that DTDE disclosed to FDS that it would be deleting the usage records. Opp. at 16–17 (citing Medlong Decl. II, Ex. 23 at DTDE0000051 and Fahimi Decl. II, Ex. 3). This argument fails for three reasons. First, neither letter makes clear that DTDE intended to delete usage records, only that DTDE intended to phase out Phoenix and the Tools. Second, the first letter was sent in 2015, which was well before DTDE's duty to preserve arose. Third, the second letter was sent in September 2018—well after DTDE's duty to preserve arose—and it did nothing to change that duty. Thus, based on the timing and circumstances of the deletion, the record supports a finding that DTDE acted with an intent to deprive.

**d. Sanction**

The record supports the finding that DTDE intentionally destroyed the usage records and that the destruction prejudiced FDS. In these circumstances, Rule 37(e)(2) provides three forms of sanction: (A) "presume that the lost information was unfavorable to the party;" (B) "instruct the jury that it may or must presume the information was unfavorable to the party;" or (C) "dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e)(2).

Here, FDS has not shown that it suffered severe prejudice, much less that the loss of the usage records prevent it from proving its case. As a result, dismissal and default judgment—the two most severe forms of sanction—are out of the question. On the other hand, the record strongly supports an inference that at the time DTDE deleted the usage records, it knew that FDS intended to file suit and that the records were highly relevant to FDS' claims. Both points suggest that the records were unfavorable to DTDE and that DTDE deleted them to prevent FDS from using them in litigation. Such conduct tends to warrant a more severe sanction.

Given the posture of the case, where FDS has survived summary judgment and trial is the next stop, an adverse jury instruction is a more appropriate form a sanction than a presumption that the lost information is unfavorable. Accordingly, the Court orders the following jury instruction:

> DTDE had electronic records showing the extent to which it used the Tools and the extent to which Aovo used the Tools. These records are highly relevant to this lawsuit, and DTDE had a duty to preserve them. DTDE violated its duty to preserve the records by deleting them before they could be reviewed by FDS. You may presume that the records were unfavorable to DTDE, including that the records showed that DTDE breached its contract with FDS by exceeding the license caps for the Tools.

## IV. CONCLUSION

For the foregoing reasons, the Court denies DTDE's motion for summary judgment and grants FDS's motion for sanctions with the above jury instruction.

**IT IS SO ORDERED.**

Dated: December 15, 2021

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California