UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FOURTH DIMENSION SOFTWARE,<br><br>Plaintiff,<br><br>v.<br><br>DER TOURISTIK DEUTSCHLAND GMBh,<br><br>Defendant. | Case No.  5:19-cv-05561-EJD<br><br>**ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND REQUEST FOR JUDICIAL NOTICE**<br><br>Re: ECF Nos. 74, 131, 133, 135, 136, 142–146 |

Presently before the Court are the parties' motions *in limine* ("MIL") and Defendant Der Touristik Deutschland GMBh's ("Defendant") motion to exclude Plaintiff Fourth Dimension Software's ("Plaintiff") expert.  ECF Nos. 131, 133, 135, 136, 142–146.  On August 15, 2023, the Court held a final pretrial conference and heard the parties' oral arguments on these motions.

The following rulings shall remain in effect throughout all phases of trial but may be revised by the Court at any time.

## I.      MOTIONS *IN LIMINE*

### A.      Plaintiff's Motions

Having considered the parties' briefing and oral arguments on these motions, the Court rules on Plaintiff's MILs, as follows:

#### 1.      Plaintiff's MIL No. 1

Plaintiff first moves to exclude the deposition testimony of third-party Gudrun Schoen[1] as

---

[1] Although Plaintiff's MIL No. 1 had sealed Schoen's name, both parties publicly referenced Schoen in the pretrial conference statement (ECF No. 163, at 9) and during the pretrial conference.

United States District Court<br>Northern District of California

1  a sanction for Defendant's alleged misrepresentations underlying its request for Schoen's trial

2  deposition.  Pl.'s MIL No. 1, ECF No. 133.  Specifically, Plaintiff accuses Defendant of deceiving

3  the Court by representing Schoen had suffered one medical emergency when, in fact, Schoen had

4  suffered another type of medical emergency; whether Defendant's counsel had contacted Schoen;

5  and whether Schoen had health concerns that limited travel.  *Id.* at 4–5.

6       The Court does not find that the substantial remedy of exclusion is warranted here.  First,

7  Plaintiff's parsing over the precise cause of Schoen's medical condition and circumstances of

8  Schoen's communications with Defendant is not well-taken.  The Court has reviewed the

9  purported inconsistencies between Defendant's representations and Schoen's actual

10  circumstances, and they do not justify the aspersions casted by Plaintiff.  A witness need not be

11  bedridden before her deposition testimony may be used at trial; indeed, Federal Rule of Civil

12  Procedure 32(a)(4) permits the use of depositions for any purpose if the witness "is outside the

13  United States" or "cannot attend or testify because of age, illness, [or] infirmity."  Fed. R. Civ. P.

14  32(a)(4).  Here, there is no dispute that Schoen resides outside of the United States, is of advanced

15  age, and has suffered a serious medical incident in the past few years.  The Court, therefore, does

16  not find any sanctionable conduct based on the representations Defendant made to Judge Breyer in

17  obtaining leave to take Schoen's deposition.

18       Nor does the fact that the deposition was taken after the close of fact discovery require the

19  total exclusion of Schoen's testimony.  As an initial matter, Judge Breyer had previously found

20  "good cause" to take Schoen's deposition outside of the regularly scheduled discovery period, and

21  the Court here has no occasion or intent to disturb that finding.  ECF No. 113.  More critically,

22  despite its concerns over Defendant's "end-run" around the discovery process, Plaintiff has failed

23  to identify any prejudice it would experience if Schoen's deposition testimony were to be

24  admitted.  Plaintiff's counsel was permitted to—and did—ask questions at Schoen's deposition,

25  and Judge Breyer expressly permitted Plaintiff to seek leave for "follow-up discovery after the

26  witness's deposition and before trial," an invitation that Plaintiff has failed to redeem.  ECF No.

27  113.  Given that Judge Breyer had previously found good cause to permit the deposition beyond

28  Case No.: 5:19-cv-05561-EJD

United States District Court
Northern District of California

1   the discovery deadlines and Plaintiff has failed to show any prejudice it would suffer, the Court

2   finds no basis to exclude Schoen's deposition testimony.

3          Accordingly, Plaintiff's MIL No. 1 is DENIED.

4          **2.     Plaintiff's MIL No. 2**

5          Plaintiff's second MIL seeks to exclude under FRE 401, 403, and 805 certain emails that

6   support Defendant's theory that Plaintiff had brought this suit as an improper attempt to pressure

7   Defendant into changing software systems.  Pl.'s MIL No. 2, at 1, ECF No. 135.  Defendant seeks

8   to introduce these emails under two theories of relevance: (1) they show Plaintiff's bad faith in

9   filing the present breach of contract action, and (2) they cast doubt on Plaintiff's claim that it only

10  discovered Defendant's conduct around 2015 or 2016.  Def.'s Opp. MIL No. 2, at 4, ECF No. 159.

11         **a.     Unclean Hands**

12         First, with respect to Plaintiff's Rule 401 objections, the Court finds that the emails at issue

13  are not relevant to Defendant's affirmative defense of unclean hands.  As a general matter, a

14  plaintiff's motive for filing suit is not relevant to a breach of contract action, *even if* the defendant

15  asserts an "unclean hands" defense.  *Comet Techs. USA Inc. v. XP Power LLC*, 2022 WL

16  1131729, at *3 (N.D. Cal. Feb. 7, 2022) ("Plaintiffs' motive for filing the suit is not relevant to the

17  unclean hands defense.").  "Such a claim would be more appropriately pursued as an action for

18  malicious prosecution, should Defendant[] prevail in the litigation."  *Applied Materials, Inc. v.*

19  *Advanced Micro-Fabrication Equip. (Shanghai) Co.*, 2009 WL 10709718, at *3 (N.D. Cal. Nov.

20  24, 2009) (citing *FLIR Sys., Inc. v. Parrish*, 174 Cal. App. 4th 1270, 1284 (2009) ("[T]he doctrine

21  of unclean hands relates to misconduct occurring before the lawsuit was filed, *not the bad faith*

22  *filing or maintenance of an action*.") (emphasis added)).

23         This holding is further supported by the requirement that the "misconduct that brings the

24  clean hands doctrine into play must *relate directly to the cause at issue*."  *Kendall-Jackson*

25  *Winery, Ltd. v. Superior Ct.*, 76 Cal. App. 4th 970, 979 (1999).  Here, the alleged misconduct, at

26  most, relates to Plaintiff's efforts to pressure Defendant into a *new* contract; the misconduct is

27  related neither to the formation of the contract Plaintiff attempts to enforce in this action nor to

United States District Court
Northern District of California

Defendant's conduct that gave rise to the alleged breach.  By way of a contrasting example, had Plaintiff successfully pressured Defendant into entering a new contract through the "misconduct" in these emails and subsequently sued to enforce that *new* contract, then that "misconduct" *would* be directly related to that subsequent hypothetical contract claim.  *See Royal Canadian Mut. Inv., Ltd. v. Home Depot U.S.A., Inc.*, 2003 WL 141360, at *1 (Cal. Ct. App. Jan. 21, 2003) ("[P]laintiff admits [that it] paid a bribe to obtain a contract from [defendant].  The doctrine of unclean hands bars a claim for damages on behalf of [plaintiff] when the contract failed to materialize.").  Under the present facts, however, the Court does not find that the emails at issue are relevant to the defense of unclean hands and, even if they held some *de minimis* relevance, their probative value would be substantially outweighed by the danger of confusing the issues or misleading the jury.

The Court, therefore, GRANTS Plaintiff's MIL No. 2 to the extent the emails are being admitted to support Defendant's unclean hands defense.

### b.      Notice and Discovery

Defendant also contends that these emails are relevant to the extent that they undermine Plaintiff's assertion that it had no knowledge of Defendant's breaching conduct prior to 2015, which is related to their statute of limitations defense.  Def.'s Opp. MIL No. 2, at 4.

The Court finds that the emails in question—all of which were sent between 2008 and 2010—are relevant to the issue of Plaintiff's discovery of Defendant's conduct.  For instance, the email dated October 16, 2008 and Bates stamped FOURTHDIMENSION_005049 mentions Defendant's "old license and money obligations."  Though it is not clear what these obligations refer to, the Court cannot conclude that the reference to "old license . . . obligations" has no relevance to the question of when Plaintiff discovered Defendant's over-licensing or sub-licensing conduct.  Plaintiff argued at the hearing that these emails could not show knowledge of Defendant's breach because Defendant's use of license was private and non-public.  However, the question of whether Defendant's over-licensing and sub-licensing conduct was private or somehow made its way to Plaintiff's ear is not one for the Court to decide on the cusp of trial.  Accordingly, the Court finds that the emails in question are relevant under Rule 401 to the

1 question of when Plaintiff discovered Defendant's breaching conduct.

2    Under Rule 403 balancing, the Court finds that there would be minimal prejudice if these

3 emails are introduced solely to show Plaintiff's discovery of Defendant's breaches.  However, the

4 Court does find that the statements referencing the "good guy, bad guy approach" or otherwise

5 implying the "extortion" theory underlying Defendant's unclean hands defense *would* be unfairly

6 prejudicial to Plaintiff.  For the reasons discussed in the subsection above, Defendant may not

7 introduce these emails to support their unclean hands defense.

8    Finally, as to Plaintiff's hearsay objections, if these documents are only being introduced

9 to prove Plaintiff's notice of "old license and money obligations" as opposed to the truth of the

10 matter asserted, these statements are not hearsay.  Fed. R. Evid. 801(c)(2).  Plaintiff's MIL No. 2

11 is DEFERRED with respect to other specific statements contained within the emails at issue.

12             * * *

13    In sum, Plaintiff's MIL No. 2 is GRANTED IN PART and DENIED AND DEFERRED

14 IN PART.  The MIL is GRANTED and the emails in question are EXCLUDED for the purpose of

15 establishing Plaintiff's motive for bringing this lawsuit or otherwise supporting the unclean hands

16 defenses without first establishing the misconduct's direct relation to the breach of contract claim

17 at issue here.  However, the MIL is DENIED to the extent the emails will be introduced solely to

18 establish Plaintiff's notice of Defendant's breaching conduct.  Any specific hearsay objections as

19 to a specific statement in these emails are DEFERRED until trial.

20      **3.**   **Plaintiff's MIL No. 3**

21    Finally, Plaintiff also moves to exclude under FRE 401 and 403 certain documents

22 pertaining to Plaintiff's financial condition, including profit and loss statements, cashflow

23 statements, transaction details, shareholder lists, meetings and report notes, balance sheets,

24 Statement of Assets and Liabilities, payroll taxes, financial forecasts, business and investment

25 plans, and other financial documents.  Pl.'s MIL No. 3, at 1, ECF No. 136.  Defendant asserts four

26 theories of relevance for this evidence: (1) Plaintiff's financial ability to fulfill its contractual

27 obligations; (2) its ability to establish harm; (3) its ability to support its damages theory; and (4) its

motivations for filing this suit.  Opp. Pl.'s MIL No. 3, at 5, ECF No. 161.

The Court finds that Plaintiff's financial condition is not relevant to Defendant's second, third, and fourth theories of relevance, as enumerated above.  Defendant does not explain why Plaintiff's financial documents would support or undermine the theory of harm and lost profits—indeed, the very premise of lost profits would suggest they do not appear in Plaintiff's financial documents.  Similarly, Defendant does not explain how Plaintiff's *internal* financial documents would bear upon the "present-day *market* value" of its software for damages calculations.  Opp. Pl.'s MIL No. 3, at 4.  And, as discussed above at Section I(A)(2)(a), Plaintiff's motivation for bringing this suit is not relevant to the merits of the breach of contract claim or Defendant's unclean hands defense, regardless of the timing of the suit.

With respect to Defendant's first theory of relevance (*i.e.*, that Plaintiff's finances would be probative of its ability to perform maintenance obligations under the contract), the Court finds that this theory is still too tenuous.  To start, Defendant has not brought a counterclaim for an alleged breach of Plaintiff's contractual obligations.  Moreover, the Court is not persuaded that financial straits would make it more or less probable that Plaintiff satisfied some undefined obligation under the contract.  In any event, any probative value that the financial documents may have would be substantially outweighed by the prejudice of casting Plaintiff as a desperate and struggling plaintiff.

Accordingly, Plaintiff's MIL No. 3 is GRANTED.  Defendant is precluded from introducing the exhibits referenced in Plaintiff's MIL No. 3 to show Plaintiff's financial conditions or motives for bringing this action.

## B.    Defendant's Motions

Having considered the parties' briefing and oral arguments on these motions, the Court rules on Defendant's MILs, as follows:

### 1.    Defendant's MIL No. 1

Defendant first moves to preclude Plaintiff from referencing the adverse jury instruction Judge Breyer ordered until after the close of evidence.  Def.'s MIL No. 1, at 2, ECF No. 142.

Case No.: 5:19-cv-05561-EJD
ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN

United States District Court
Northern District of California

1    Having reviewed the parties' positions and heard the parties' oral arguments, the Court believes

2    that reasonable limitations on the reference to the adverse instruction are warranted.

3        Opening Statements: Defendant agrees that Plaintiff should be permitted to state that the

4    evidence will show that user logs were missing and that Defendant failed to preserve the user logs.

5    Def.'s MIL No. 1, at 3–4.   The Court will additionally permit Plaintiff to reference Defendant's

6    duty to preserve those records, as well as to describe generally what those records are.  Plaintiff

7    may also provide a general overview of the trial process, including the jury instructions and the

8    fact that the instructions may include presumptions the jury may draw from the evidence.

9        However, the Court will not permit Plaintiff to discuss the substance and mechanics of the

10   adverse jury instruction in opening statements.  For instance, Plaintiff may not reference the fact

11   that the jury may presume the missing evidence was unfavorable or that the missing records

12   contained evidence of Defendant's breach.  *See id.* at 3–4.  Plaintiff also may not inform the jury

13   that Judge Breyer had ordered an adverse inference instruction be given.

14       Examination: With respect to witness examinations, Plaintiff may ask witnesses about the

15   underlying facts relating to the spoliation, such as whether Defendant produced all records, why it

16   failed to produce certain records, and whether and why Defendant deleted certain records.

17       Plaintiff, however, may not reference the adverse inference instruction itself or any of the

18   legal conclusions that Judge Breyer made in ordering the instruction during any examination.

19       Subject to the principles and examples above, Defendant's MIL No. 1 is GRANTED IN

20   PART and DEFERRED IN PART as to any examples that fall outside of those specifically

21   referenced above.

22           **2.        Defendant's MIL No. 2**

23       Defendant's second MIL seeks to exclude certain correspondence between the parties'

24   counsel that occurred shortly before this action was filed.  Def.'s MIL No. 2, at 2, ECF No. 143.

25   During oral arguments, Plaintiff represented that it did not intend to introduce these documents

26   unless Defendant attempts to re-litigate Judge Breyer's spoliation findings and suggested that

27   there may not be a dispute as to these documents.

28   Case No.: 5:19-cv-05561-EJD
     ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN

United States District Court
Northern District of California

1    Defendant's MIL No. 2 is GRANTED.  The settlement communications identified in

2    Defendant's MIL No. 2 shall be EXCLUDED from trial except for impeachment purposes.

3           **3.     Defendant's MIL No. 3**

4    Defendant moves to exclude certain meeting notes drafted by Plaintiff's employee

5    pertaining to a call between employees of third-party Aovo and Plaintiff.  Def.'s MIL No. 3, at 2,

6    ECF No. 144.  Defendant's MIL is based on double hearsay not subject to any exception.

7           **a.     First Layer Hearsay: Meeting Notes**

8    The first hearsay issue with this document arises from the fact that it purports to be the

9    written recollections of Katherine Hamilton regarding a meeting she had attended.  The Court

10   finds that this first hearsay layer falls under the "present sense impression" exception to hearsay,

11   which permits statements "describing or explaining an event or condition, made while or

12   immediately after the declarant perceived it."  Fed. R. Evid. 803(1).

13   The meeting notes appear to have been contemporaneously drafted by Ms. Hamilton as she

14   was attending and listening to the meeting, and she subsequently circulated her notes to Plaintiff's

15   attendees.  Defendant's only objection to the applicability of the "present sense impression"

16   exception is that Ms. Hamilton's notes were circulated an hour later, which it argues is too long of

17   a period for the exception to apply.  This analysis, however, misunderstands how this time period

18   should be measured.  Though she circulated her notes an hour after the meeting, Ms. Hamilton did

19   not wait an hour before *writing* the notes; she had taken the notes contemporaneously as

20   participants were speaking.  *See* Bari Decl. ¶ 2, Ex. A ("Hamilton Dep.") 122:23–123:8; *see*

21   *United States v. Perl*, 492 F. App'x 37, 40 (11th Cir. 2012) (affirming application of the present

22   sense impression exception where "notes were taken contemporaneously with the telephone

23   conversations with the [declarants]"); *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d

24   487, 502 (D. Del. 2005) (applying the exception where scrivener was "present at these meetings

25   and discussions, and while he was not asked to be a stenographer for the meeting, he

26   contemporaneously recorded what transpired").  The relevant time period, therefore, between Ms.

27   Hamilton's perception and her written statements would likely be mere seconds, well within the

28   Case No.: 5:19-cv-05561-EJD

1   contemplation of the "present sense impression" hearsay exception.

2         To the extent Defendant suggest that the hour between the meeting's adjournment and the

3   notes' circulation gives rise to untrustworthiness, a quick review of the meeting notes would put

4   such concerns to rest.  Ms. Hamilton's meeting notes are written akin to a transcript, with each

5   declarant's statements designated by initials—nowhere does it appear that the scrivener has

6   injected her own interpretations or reflections.  *Cf. In re Cirrus Logic Sec. Litig.*, 946 F. Supp.

7   1446, 1469 (N.D. Cal. 1996) (rejecting present sense impression exception for meeting notes

8   where declarant "testified that his notes contain his interpretations and analyses of conversations

9   with Cirrus executives").  Furthermore, there are minor typographical and punctuation errors that

10  reinforce the inference that the notes were taken quickly with only minimal correctional edits.

11        Because the meeting notes here were written likely mere seconds after the relevant

12  participants had uttered their statements, reflect a memorialization of the conversations during the

13  meeting in question, and do not exhibit any indication of Ms. Hamilton's own interpretations, they

14  fall within the "present sense impression" exception to hearsay.  *See, e.g.*, *Neumeyer v. Wawanesa*

15  *Gen. Ins. Co.*, 2015 WL 1924981, at *5 (S.D. Cal. Apr. 24, 2015) ("Notes taken during meetings

16  are admissible as present sense impressions under Federal Rule of Evidence 803(1)."); *Steffens v.*

17  *Regus Grp., PLC*, 2013 WL 4499112, at *18 (S.D. Cal. Aug. 19, 2013) (collecting cases holding

18  that "notes from a conversation or meeting *may* satisfy the present sense impression exception").

19  The meetings notes, therefore, may not be excluded based on the first layer of hearsay.

20                    **b.      Second Layer Hearsay: Participants' Statements**

21        The second hearsay issue relates to the statements attributed to the participants of the

22  meeting, most notably the representatives from Aovo, Gerhard Griebler and Thomas Krell.  As an

23  initial matter, the Court agrees that nearly the entirety of Ms. Hamilton's notes are hearsay

24  statements, as the notes specifically attribute certain statements to certain speakers.  Accordingly,

25  these statements are not admissible unless they fall within a hearsay exception or are used for non-

26  hearsay purposes.

27        The Court finds that certain statements attributed to the Aovo representatives fall within

United States District Court
Northern District of California

the hearsay exception for "then-existing state of mind (such as motive, intent, or plan)." Fed. R. Evid. 803(3). For example, Pavolotsky asks Griebler, "what are your *plans*," to which Griebler responds, "[w]e *plan* to use Phoenix as long as it supports all of our business." Medlong Decl., Ex. 1, FOURTHDIMENSION_003580 (emphasis added). Under the Rule 803(3) exception, these statements may be used to establish that Griebler did, in fact, intend to "use Phoenix as long as it supports all of [his] business," as of March 2, 2016, the date of the meeting. Other statements that would fall under this exception include Krell's remark that "[r]ight now we are just looking for licenses for EPSPEW," Krell's statement that they "want to move over to Phoenix Unlimited from Phoenix Class. And we want to give Classic to clients," and Griebler's statement that they "would cancel all contracts next year. We want to make deal now [*sic*] and you can connect directly with our clients for maintenance licensing." *Id.*, at FOURTHDIMENSION_003580–3582; *see also, e.g.*, *Cousens v. Transamerica Life Ins. Co.*, 2023 WL 3564936, at *4 (C.D. Cal. Apr. 18, 2023) ("[Plaintiff's] account of her father's statement of his plan—to mail the insurance check— therefore, is admissible to demonstrate that [he] left the house intending to mail the check."); *Arevalo v. Chipotle Servs., LLC*, 2016 WL 7045606, at *1 (C.D. Cal. Mar. 7, 2016) ("[T]o the extent plaintiff were to introduce testimony that he told friends, relatives, and other individuals that he intended to complain about his alleged harassment to his supervisors, such testimony is relevant to demonstrate defendants state of mind—*i.e.*, that, at least at the time he made these statements, plaintiff intended to complain to his supervisors."). These statements all purport to describe the declarants' future business plans and, therefore, may be used to show that the declarants had such plans on March 2, 2016.

However, notwithstanding the statements of the meeting participants' future plans, Ms. Hamilton's notes also contain many statements that do *not* speak to future plans or intentions. For instance, the notes reflect statements regarding Aovo's origins and past business operations with Defendant. *See* Medlong Decl., Ex. 1, FOURTHDIMENSION_003581 ("In 2000 or so Phoenix Classic was released to us from DER. . . . We have many contracts from DER and those kick out in the software. We have overlooked licensing for these products."). These statements do not fall

United States District Court
Northern District of California

1    under the state-of-mind exception, as they are statements of memory recalling events in the past.

2    *See* Fed. R. Evid 803(3) (barring the use of a "statement of memory . . . to prove the fact

3    remembered").  Other than the state-of-mind exception, Plaintiff has not identified any other

4    hearsay exception that would apply to the meeting participants' hearsay statements.[2]  Accordingly,

5    any statements in Ms. Hamilton's notes that do *not* relate to the declarant's then-existing state of

6    mind, intent, or plans are inadmissible hearsay.

7                                            * * *

8         In summary, Defendant's MIL No. 3 is DENIED IN PART.  Plaintiff may use the

9    statements in the meeting notes to establish the declarants' then-existing state of mind, motive,

10   intent, or plan per Rule 803(3).  However, Defendant's MIL No. 3 is GRANTED as to all other

11   statements in the meeting notes and DEFERRED IN PART as to any specific statements or other

12   hearsay exceptions that Plaintiff may raise at trial.

13                      **4.        Defendant's MIL No. 4**

14        Defendant's fourth MIL seeks to preclude Plaintiff from offering testimony or posing

15   questions relating to "unasserted claims," *e.g.*, trade secret misappropriation, copyright

16   infringement, or violation of a non-compete obligation.  Def.'s MIL No. 4, at 2, ECF No. 145.

17        Defendant's requested exclusion is largely in the abstract, as this MIL does not specify any

18   particular document, testimony, or evidence that Defendant seeks to exclude.  Plaintiff has also

19   represented—both in its responsive brief and at oral arguments—that it intends to only address

20   issues pertaining to the breach of contract, not any unasserted claims.  As this stage, the Court

21   declines to engage in any preemptive *a priori* evidentiary determinations and DEFERS ruling on

22   this issue until a concrete objection to specific evidence has been made at trial.

23                      **5.        Defendant's MIL No. 5**

24        Finally, Defendant moves to preclude any new evidence from Plaintiff to excuse its delay

---

[2] Although Plaintiff also invokes the Rule 807 residual hearsay exception, they only apply it to the first layer of hearsay as to Ms. Hamilton's notes and not to the hearsay arising from the meeting participants' statements.  Opp. Def.'s MIL No. 3, at 6.

United States District Court
Northern District of California

1  in bringing this suit.  Def.'s MIL No. 5, at 2, ECF No. 146.  Specifically, Defendant contends that

2  Plaintiff "should be held to its testimony that the only new fact that allegedly came to light in 2016

3  was that it learned of DTDE's hosting of software for Aovo."  *Id.*

4        Defendant again appears to be bringing a preemptive evidentiary objection without any

5  specific evidence or testimony it is seeking excluded.  Although Defendant's MIL quotes

6  extensively from Ms. Hamilton's deposition, Defendant does not seek to exclude any existing

7  testimony but rather objects to some undefined new theory that Plaintiff may or may not advance.

8  At this time, such a line is too nebulous and speculative for the Court to evaluate in the abstract.

9        Accordingly, the Court will DEFER ruling on this issue until it rears its head at trial.

10  However, the Court acknowledges Defendant's fairness concerns and will remind the parties of

11  the Court's discretion to "fashion remedies to prevent surprise and unfairness" at trial.  *Columbia*

12  *Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir.

13  2001) (quoting William A. Schwarzer, *et al.*, *Federal Civil Procedure Before Trial*, ¶ 11:37 at 11–

14  29 (2000)).

15  ## II.     MOTION TO EXCLUDE PLAINTIFF'S EXPERT, DR. ERIC COLE

16        Defendant moves to exclude the damages opinion of Plaintiff's expert Dr. Eric B. Cole

17  based on its unreliability per Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579

18  (1993).  Mot. Exclude Dr. Eric Cole ("*Daubert* Mot."), ECF No. 131.  Defendant also argue that

19  Dr. Cole's opinions should be excluded under Rule 403.

20       **A.**     **Legal Standard**

21        Courts act as gatekeepers of expert testimony to ensure that such testimony is reliable and

22  relevant under Federal Rule of Evidence 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147

23  (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The proponent of

24  expert testimony has the burden of proving admissibility.  *In re Korean Ramen Antitrust Litig.*,

25  281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted).  Before an expert can offer her

26  opinions, she must be qualified by "knowledge, skill, experience, training, or education."  Fed. R.

27  Evid. 702.  Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's

28  Case No.: 5:19-cv-05561-EJD

1    scientific, technical, or other specialized knowledge will help the trier of fact to understand the

2    evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

3    the testimony is the product of reliable principles and methods; and (d) the expert has reliably

4    applied the principles and methods to the facts of the case." *Id.*  This multifactor inquiry is

5    flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission."  *Wendell v.*

6    *GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted).

7    **B.    Dr. Cole's Expert Opinions**

8    Although Dr. Cole has provided two opinions for this matter, Defendant is primarily

9    focused on Dr. Cole's calculation of damages and valuation of lost licensing fees.  *See* Expert

10   Report Eric B. Cole ("Cole Report") ¶ 22, ECF No. 131-1.  Dr. Cole provides two charts, each

11   containing three projected models for damages: Chart 1 applies to the EasyClient Run-Time

12   software, which is licensed per user; and Chart 2 relates to the other three software (EasyClient

13   Designer, EasyPath, SafePath) that are licensed on an enterprise or per company basis.  *See* Cole

14   Report, Charts 1, 2, ECF No. 131-1, at 26–27.

15    With respect to Dr. Cole's damages calculation for the "per user" EasyClient Run-Time

16   licenses, he begins with the base monthly software cost per license, calculated as 1.5% of the

17   license's list price.  He then progressively increases the license cost over the years based on an

18   "estimate . . . of the increase of users each year."  Cole Report ¶ 51.  Dr. Cole relies on

19   information from Defendant's website to estimate the number of travel agents it employed and

20   assumes that all agents would require a license.  Cole Report ¶ 55(C).  In his mid-range (Model

21   2A) and high-end (Model 3A) projections for the "per user" license, Dr. Cole increases the base

22   license costs over time from $100 to anywhere between $200 and $500, noting that "[i]t is

23   common for licenses to increase based on the growth of the company" and "[i]t is common for the

24   price to increase year over year."  Cole Report, Chart 1.

25    With respect to Dr. Cole's calculations for the "per company" licenses, he also begins with

26   the base price of the software and then "a certain percent is used to increase the price year by year

27   for the licensed software as well as maintenance fees."  Cole Report ¶ 51.  Dr. Cole notes that

28   Case No.: 5:19-cv-05561-EJD
ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN
13

"[t]here is no formal standard used across the industry but based on my extensive experience, this is the standard approach that is used by most companies." *Id.* Dr. Cole's conservative Model 1B calculates the lost licensing fees as Defendant originally paid for them; his mid-range Model 2B calculates the licenses based on a "Published Adjusted Present Day Value" based on a 2016 licensing proposal that Plaintiff had extended to Aovo; and the high-end Model 3B "multiplies the license by four to account for the growth of the company." Cole Report, Chart 2.

### C. Discussion

As an initial matter, the Court finds that Dr. Cole is sufficiently qualified to provide an opinion on software license valuations and damage calculations. Although Defendant makes a passing argument in its Reply that Dr. Cole is only qualified as a cybersecurity expert and not a damages expert, the Court finds that Dr. Cole has substantial industry experience in "evaluating software and determining the licensing and value of that software" and has "been actively involved in many negotiations involving the value and fair price of software." Cole Report ¶¶ 5– 6. This is sufficient to qualify Dr. Cole as an expert, at minimum, by experience.

### 1. Pricing Methodology

Defendant first takes issue with Dr. Cole's reliance on a "2016 Licensing Agreement" and how he calculated the value of Plaintiff's software, specifically the year-over-year ("YOY") increases in software price.

The Court finds that Dr. Cole's reliance on the "2016 Licensing Agreement" does not warrant exclusion of his opinions or damage calculations. Defendant's concerns with soundness of the 2016 Licensing Agreement's figures are well-taken, but weaknesses in an expert's factual underpinning go to the opinion's weight, not its admissibility. *See, e.g.*, *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 (9th Cir. 1987) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility. The weakness in the underpinnings of [expert] opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony.") (internal citation omitted); *Richan v. Fleetwood Motor Homes*, 2010 WL 11519497, at *5 (C.D. Cal. Dec.

9, 2010) ("Although a court may exclude expert opinions that are merely conclusory assertions, unsupported by specific facts, it has been held that an expert's failure to consider certain facts 'bear[s] on the weight of the evidence rather than on its admissibility.'") (internal citation omitted).  Defendant is free to cross-examine Dr. Cole's reliance on the 2016 Licensing Agreement, but the Court will not exclude his opinions based on this reliance alone.

Turning next to the bases for Dr. Cole's YOY increases in software price, the Court finds that the specific incremental price increases are not the product of a reliable method.  Dr. Cole explains that these incremental increases in the cost of a license are "based on [his] extensive experience" and account for "natural increases in the cost of a license and appropriate maintenance and update fees."  Cole Report ¶ 51.  Although this would be sufficient to support an opinion that YOY increases in license prices are typical in the software industry, it does not set forth a method—reliable or otherwise—for determining the *quantum* of those increases.  Dr. Cole simply states that "a certain percent is used to increase the price year by year" (Cole Report ¶ 51), but he never specifies what that percentage is or how it is derived.  For instance, Dr. Cole's Model 3A inexplicably begins at $300 for the software price (a $200 increase from the price Defendant originally paid for the license), which increases to $400 in 2007, and increases again to $500 in 2013.[3]  Cole Report, Chart 1, Model 3A.  The Court recognizes that Dr. Cole purportedly estimated the price increase for his Model 3A "[b]ased on the proposed 2016 licensing agreement."  Cole Report, Chart 1.  However, even if he began with two data points (*i.e.*, the original prices Defendant paid and the prices in the 2016 proposal), Dr. Cole fails to explain how he extrapolated from those figures to the specific incremental price increases in Model 3A.

This unexplained extrapolation also appears in Dr. Cole's "Published Adjusted Present Day Value" used in Models 2B and 3B in his Chart 2, which he supports by simply stating "[t]his model is based off of the prices from the 2016 license proposal."  Cole Report, Chart 2, Models

---

[3] Dr. Cole's Model 2A also reflects a software price increase from $100 to $200, but the Court finds this increase to be reliable and tolerable under Rule 702, as $200 was the original undiscounted list price for the EasyClient Run Time software.  See Coel Report ¶ 55.

2B, 3B. Without any description or explanation of how Dr. Cole arrived at these figures, the Court cannot discern *any* method that Dr. Cole used, much less evaluate the method's reliability.

While Dr. Cole very well may have had the experience and knowledge to develop such a method, even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 994 (7th Cir. 2019). The Court finds that Dr. Cole's reliance on the "2016 Licensing Agreement" does not render his opinions inadmissible, but his failure to demonstrate that his projected software price increases are "the product of reliable principles and methods" does warrant exclusion. Accordingly, the Court GRANTS Defendant's motion to exclude Dr. Cole's opinions on the quantum of software price increases over time, including his damages calculations in Models 3A, 2B, and 3B of his expert report.

### 2.    User Metrics Methodology

Defendant also challenges Dr. Cole's opinions and methodologies in calculating users of Plaintiff's software. Specifically, it argues that Dr. Cole made erroneous assumptions, failed to account for fluctuations, and failed to consider the disputed contract language. *Daubert* Mot. 8–9.

The Court finds that, to the extent Defendant takes issues with the assumptions or lack thereof undergirding Dr. Cole's opinions on user metrics, those arguments again bear upon the opinions' weight, not admissibility. *See supra* Section II(C)(1). Dr. Cole's opinions as to the number of users that would require licenses are based on figures taken from Defendant's own website. Cole Report, at 17 nn. 35–37. He then imports those figures into his calculations without modification in Model 2A, despite noting that those figures are likely conservative. *Id.* The Court finds that this a sufficiently reliable method for determining the number of additional licenses that Defendant would have had to purchase for the purposes of Rule 702. Defendant will be free to cross-examine Dr. Cole's choice of data, but his direct use of Defendant's own publicly available data does not warrant exclusion for unreliability.

Accordingly, the Court will not exclude the portions of Dr. Cole's Chart 1 that set forth the incremental increases in the number of Defendant's agents that would require licenses.

United States District Court
Northern District of California

### 3.    Opinions on Legality and State of Mind

Defendant also moves to exclude the portions of Dr. Cole's report that opine on issues beyond the scope of his expert testimony, such as whether Defendant "illicitly sublicensed" Plaintiff's software or as to Defendant's state of mind in deleting user logs. *Daubert* Mot. 9–10.

The Court agrees with Defendant that Dr. Cole may not issue expert opinions on the legality of Defendant's actions or Defendant's state of mind.  Furthermore, at oral argument, Plaintiff's counsel represented that Dr. Cole's opinion regarding the intentionality of Defendant's spoliation will not be referenced unless Defendant attempts to re-litigate Judge Breyer's findings. The Court accepts Plaintiff's representations and, therefore, will GRANT Defendant's motion to exclude the portions of Dr. Cole's report opining on the legality of Defendant's actions or Defendant's state of mind.

### 4.    Overall Reliability

Finally, Defendant assails Dr. Cole's expert report with a smattering of reliability arguments, such as his general remarks regarding industry practices and his failure to consider the full record in forming his opinions. *Daubert* Mot. 11–13.  The Court will note again that weaknesses in the factual bases for Dr. Cole's opinions may be attacked on cross-examination but do not warrant exclusion on a *Daubert* motion.  *See supra* Section II(C)(1).

Defendant also highlights Dr. Cole's calculation error in failing to offset the amounts that Defendant had already paid in his damages calculation.  *Daubert* Mot. 7–8.  At oral arguments, Plaintiff's counsel conceded that proper damages calculations should account for the amounts that Defendant already paid and that they intend to present evidence or witnesses that would provide corrected figures and calculations.  The Court, therefore, concludes that no further action would be necessary regarding Dr. Cole's offset calculation at this time.

* * *

In summary, Defendant's motion to exclude Dr. Cole's expert testimony is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as to Dr. Cole's opinions on how much Plaintiff's software and license prices would increase between 2000 and 2018, as well as the

Case No.: 5:19-cv-05561-EJD
ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN

United States District Court
Northern District of California

1    damages calculations in Models 3A, 2B, and 3B.  The motion is also GRANTED as to Dr. Cole's

2    opinions regarding the legality of Defendant's conduct and Defendant's state of mind.

3        Defendant's motion is DENIED as to Dr. Cole's reliance on the "2016 Licensing

4    Agreement," his opinions on the increase in user numbers, and Defendant's remaining criticisms

5    as to Dr. Cole's overall reliability.

6    **III.    REQUEST FOR JUDICIAL NOTICE**

7        At oral arguments, the parties informed the Court of Defendant's pending request for

8    judicial notice, filed on October 6, 2021, in support of its motion for summary judgment.  Def.'s

9    Request Judicial Notice ("RJN Mot."), ECF No. 74.  In that request, Defendant sought judicial

10    notice of eight exhibits, and Plaintiff opposed judicial notice of Exhibits 1–5.[4]  *Id.*; ECF No. 86.

11    On December 15, 2021, Judge Breyer denied Defendant's motion for summary judgment and

12    referenced the request for judicial notice; however, the Order did not directly grant or deny the

13    request for judicial notice.  ECF No. 92.

14        Per Federal Rule of Evidence 201, the Court may take judicial notice of a "fact that is not

15    subject to reasonable dispute because it: (1) is generally known within the trial court's territorial

16    jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

17    reasonable be questioned."  Fed. R. Evid. 201(b).  Having reviewed the parties' briefs and the

18    exhibits for which Defendant seeks judicial notice, the Court rules as follows:

19        Exhibits 1–3, BaFin's statements of German law):  Defendant requests judicial notice of

20    three webpages from the German Financial Supervisory Authority ("BaFin") that set forth the

21    prospectus obligations for companies that offer securities to the public.

22        Per Federal Rule of Civil Procedure 44.1, "[i]n determining foreign law, the court may

23    consider any relevant material or source."  Indeed, the Ninth Circuit has held that "because foreign

24    law interpretation and determination is a question of law, independent judicial research does not

25    implicate the judicial notice and *ex parte* issues spawned by independent factual research

26

27    _____
     [4] The Court GRANTS Defendant's unopposed request for judicial notice as to Exhibits 6–8.

28    Case No.: 5:19-cv-05561-EJD
     ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN

United States District Court
Northern District of California

1   undertaken by a court." *de Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir. 2016).  Here, the

2   Court finds that the German regulations as reflected in the official BaFin webpages can be

3   accurately and readily determined from BaFin, a source whose accuracy on German securities law

4   cannot reasonably be questioned.

5        Plaintiff's opposition does not truly take issue with or dispute the accuracy of German

6   securities regulations; rather, it simply paints Defendant's Exhibits 1–3 as "an attempt to prove

7   that Aovo's use of Phoenix was a matter of public record."  Pl.'s Opp'n Request Judicial Notice

8   ("RJN Opp."), at 3, ECF No. 86.  However, taking judicial notice of publicly available German

9   law is distinct from the factual question of whether Aovo's conduct was public record.

10       Accordingly, the Court GRANTS Defendant's request and takes judicial notice of the

11  German law contained in Exhibits 1–3.  However, the Court does not adopt the corresponding

12  facts and summaries that Defendant provided in its request.  See RJN Mot. 1–3.

13       <u>Exhibits 4–5, Aovo's Prospectus and English translation</u>:  Defendant also seeks judicial

14  notice of the fact that Aovo filed a public corporate prospectus on November 29, 2006,

15  concurrently with its initial public offering.  RJN Mot. 2–3.

16       The Court finds that the fact that, on November 29, 2006, Aovo filed a prospectus with

17  German regulators is one that is not subject to reasonable dispute because it "can be accurately and

18  readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.

19  201(b).  Accordingly, the Court will take judicial notice of the fact that Aovo filed the prospectus

20  provided in Exhibits 4 and 5, as well as the fact that Aovo made the statements contained therein.

21  These are facts that Plaintiff cannot reasonably dispute.

22       However, the Court will not—and cannot—take judicial notice of the truth of statements

23  made in the prospectus, nor will it assume any facts as to notice or constructive notice arising from

24  the prospectus's filing.  *See, e.g.*, *Russian Hill Cap., LP v. Energy Corp. of Am.*, 2016 WL

25  1029541, at *3 (N.D. Cal. Mar. 15, 2016) (taking judicial notice of prospectuses "as public records

26  to the extent that they show Defendant [] made the statements contained therein" but declining to

27  "assume the truth of those statements to the extent that Plaintiff might contest their veracity").

28  Case No.: 5:19-cv-05561-EJD
ORDER RE: MOTIONS *IN LIMINE*, *DAUBERT* MOTION, AND RJN

19

United States District Court
Northern District of California

1    Accordingly, the Court GRANTS Defendant's request for judicial notice as to Exhibits 4

2    and 5.  The Court takes judicial notice of Aovo's filing of its prospectus and the fact that it had

3    made statements contained therein.  However, the Court will *not* take judicial notice and does not

4    assume any fact regarding the truth of the prospectus's statements or any notice the prospectus

5    may have provided.

6    **IV.    CONCLUSION**

7    Based on the foregoing, the Court rules on the parties' MILs, Defendant's *Daubert* motion,

8    and Defendant's request for judicial notice, as follows:

9    1.  Plaintiff's MIL No. 1 is DENIED;

10   2.  Plaintiff's MIL No. 2 is GRANTED IN PART and DENIED and DEFERRED IN

11       PART;

12   3.  Plaintiff's MIL No. 3 is GRANTED;

13   4.  Defendant's MIL No. 1 is GRANTED IN PART and DEFERRED IN PART;

14   5.  Defendant's MIL No. 2 is GRANTED;

15   6.  Defendant's MIL No. 3 is GRANTED IN PART and DENIED IN PART;

16   7.  Defendant's MIL No. 4 is DEFERRED until trial;

17   8.  Defendant's MIL No. 5 is DEFERRED until trial;

18   9.  Defendant's Motion to Exclude Dr. Eric Cole is GRANTED IN PART and DENIED

19       IN PART;

20   10. Defendant's Request for Judicial Notice is GRANTED.

21   **IT IS SO ORDERED.**

22   Dated: August 18, 2023

23

24   

25   EDWARD J. DAVILA
     United States District Judge

26

27

United States District Court
Northern District of California